TABLE OF CONTENTS OF CONTENTS
MEMORANDUM OF DECISION
I — Factual Findings
A. Procedural History
B. The Respondent Mother CT Page 8643
C. The Respondent Father, Raul R.
D. The children
1. Marcus
2. Ana Cristina
3. Juan and Alexus
II — ADJUDICATORY DECISION
A. Location and Reunification
1. Reasonable efforts to locate
2. Reasonable efforts to reunify
B. Statutory Grounds for Termination
1. Failure to Rehabilitate
a. Applicable Legal Standard
 b. Claim that respondent mother has failed to rehabilitate
 c. Claim that respondent father Raul R. has failed to rehabilitate
2. Abandonment
a. Applicable Legal Standard
 b. Abandonment claims as to respondent mother
3. No Ongoing Parent-Child Relationship
a. Applicable Legal Standard
 b. Claim that mother has no ongoing parent-child relationship
c. Claim that respondent father Raul R. CT Page 8644 has no ongoing parent-child relationship with Ana Cristina
III — DISPOSITION
A. Required Statutory Findings
 1. The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent — § 17a-112 (k)(1)
 2. Whether DCF of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended — § 17a-112 (k)(2)
 3. The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order — § 17a-112 (k)(3)
 4. The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties — § 17a-112 (k)(4)
5. The age of the child — § 17a-112 (k)(5)
 6. The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the-best interest of the child to return him to his home in the foreseeable fixture, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child — § 17a-112 (k)(6)
 7. The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other CT Page 8645 person or by the economic circumstances of the parent — § 17a-112 (k)(7)
B. Best Interests of the Child — § 17a-112 (j)(2)
1. Marcus
2. Ana Cristina
3. Juan and Alexus
IV — Order of Termination
 MEMORANDUM OF DECISION
This case is a petition brought by the Commissioner of the Department of Children and Families (DCF) to terminate the parental rights of Ana Luz R., Henry J., Raul R., and Juan Luis L., Sr., who are the biological parents of the minor children at issue in this proceeding. For the reasons stated below, the court grants the petitions.
The trial of this case was held before this court on March 12 and March 13, 2001. The respondent mother was represented by her attorney but did not attend the trial. Raul R., the respondent father of the minor child Ana Christina, was represented by his attorney and present during the proceedings. The biological fathers of the three other minor children were not present at trial, the Superior Court having previously accepted their written consents to termination of their parental rights.[2] The petitioner and the minor children were represented by their respective counsel throughout the proceeding.
DCF alleges the grounds for terminating each respondent's parental rights as follows:
 • As to the respondent mother, Ana Luz R., DCF alleges that she has abandoned each child, has no ongoing parent-child relationship with any of them, and has failed to rehabilitate herself
 • As to the respondent father Raul R., DCF alleged in its petition three grounds, abandonment, no ongoing parent-child relationship, and failure to rehabilitate. Since counsel for the petitioner informed the court in its closing argument that DCF had elected not to continue pursuing the claim of abandonment, the court will treat that claim as abandoned. CT Page 8646
 • As to the respondent fathers Henry J., and Juan Luis L., Sr., DCF alleges consent as grounds for terminating their parental rights.
The petitioner called as its witnesses two DCF social workers (Rosalind McFadden and Angeline Doyle) a DCF case aide (Noel Perez), department of corrections officer John Aldi, and a licensed clinical psychologist (Dr. Eneida M. Silva, Ph.D.) who had conducted court-ordered psychological evaluations of the respondent mother, Ana R., and the respondent father Raul R., and parent-child interactional assessments of these two respondents with their minor children. Neither respondent offered testimony from any witnesses. DCF introduced into evidence fifteen documentary exhibits. The respondent father Raul R. offered into evidence two documentary exhibits.
The court finds that the Child Protection Session of the Superior Court, Juvenile Matters Division, has jurisdiction over the pending matter. The court finds that all parents were served with the petitions and have appeared through counsel. No action is pending in any other court affecting custody of these children.
 I — FACTUAL FINDINGS
The court has carefully considered the verified petition, all of the evidence, including the social study and addendum entered into evidence as exhibits, and the testimony presented, according to the standards required by law.[3] Upon such consideration, the court finds that the following facts were proven by clear and convincing evidence at trial, as well as additional such included in subsequent sections of this decision:
A. PROCEDURAL HISTORY
On February 11, 1997, after six previous referrals of the respondent mother to DCF, DCF obtained an Order of Temporary Custody (OTC) of her four minor children. Four days earlier, DCF had received an anonymous report that three-year-old Ana Cristina was being sexually molested. A social worker who went to the home found the mother absent, the four children in the care of a teenager who did not know when their mother would return, the apartment filthy, and the children without adequate food. (Social Worker Affidavit submitted in support of OTC.) On February 21, 1997, the court, Teller, J., sustained the OTC.
On May 12, 1997, the court, D'Addabbo, J. entered an order of specific Expectations of the Court to facilitate the respondent mother in CT Page 8647 regaining custody of the children.[4] On June 12, 1997, the respondent mother entered a nolo contendere plea to the allegation of neglect, and the court, D'Addabbo, J., found the children neglected and uncared-for and committed them to DCF. The Memorandum of Hearing signed by the court that day specifically noted that the respondent fathers stood silent with regard to the pleas and findings of neglect and uncared-for; it further noted that the commitment was entered "without prej[udice] to Mr. R."
On July 13, 1999, the court, Keller, J., found, at a hearing held pursuant to General Statutes §§ 17a-110 (b)[5] and 17a-111b
(b)[6], that further efforts to reunify the children with the respondent mother were no longer appropriate. The court takes judicial notice of the contents of its own file; although the court.that day also made such a finding as to the respondent father Raul R., the Memorandum of Hearing for June 10, 1999, one month earlier, states that "State is not seeking a no longer appropriate finding as to Mr. R. He is excused from next hearing." This court thus finds that the finding on July 13, 1999, that reunification efforts were no longer appropriate is not binding on or applicable to Mr. R., for he had no notice of or opportunity to contest that finding and was not present at the hearing. Applying that finding to him would violate his constitutional right to due process of law and his statutory right to a hearing. Thus the court must determine, in the trial of this matter, whether clear and convincing evidence establishes that DCF made reasonable efforts to reunify the respondent father, Mr. R., with his minor child Ana Cristina.
On August 13, 1999, DCF filed petitions to terminate the parental rights of each of the respondent parents. As to the respondent mother, DCF claimed the grounds of abandonment, failure to rehabilitate, and no-ongoing parent-child relationship. As to the respondent father Raul R., DCF pleaded abandonment and no ongoing parent-child relationship. On May 18, 2000, the court, Shapiro, J, granted DCF's motion to amend the petition to allege the additional ground of failure to rehabilitate as to the respondent father, Raul. R., and to allege additional adjudicatory facts as to the respondent mother and Mr. R.
B. THE RESPONDENT MOTHER
Ana Luz R. was born on October 1975. (Pet Ex. 1 at 3.) Growing up she witnessed domestic violence between her parents (she reported to Dr. Silva that she once saw her father drag her pregnant mother down the stairs), and her father sexually abused her and once kidnaped her when she was young. (Pet. Ex. 2 at 5.) She had difficulty in school, where she was suspended often for fighting. After dropping out of school following ninth grade, she began using drugs "to relieve herself from stress at home" and became pregnant with the first of her six children. (Id.) She CT Page 8648 told Dr. Silva that she had used marijuana, PCP and crack cocaine since age 12. (Id. at 6.) In her own intimate relationships as an adult she has experienced domestic violence. (Id. at 5-6.)
After the state removed the four children at issue from her custody in 1997, Ms. R. had increasingly rare contact with them. Initially she had unsupervised visits with her children, but after DCF substantiated a report that she physically abused Ana Cristina during a visit, DCF halted unsupervised visits with Marcus and Ana Cristina on June 24, 1998. (Pet. Ex. 1 at 10-11.) Although DCF then offered her supervised visits, she rarely visited her children after that. For several months last year DCF did provide monthly visits for Ms. R. with Ana and Marcus together; but because she was late for these visits numerous times, DCF told her that she needed to confirm her intention to attend visits by calling DCF the day before a scheduled visit. After a period of no contact with her, DCF last August discontinued the visits with Ana or Marcus because of her failure to call in to schedule visits. She has not seen or had contact with either of these children since. (Testimony of Angeline Doyle.) Other than the parent-child interaction conducted by Dr. Silva in July 2000, her last visit or contact with Juan and Alexus was the summer of 1998, despite the fact that DCF has offered her unlimited and unscheduled visits with them at the home of the foster parent, their paternal grandmother. (Testimony of Angeline Doyle.) Nor has she sent them, or to DCF on their behalf, any cards, letters, or gifts since then. Moreover, she did not show up at DCF treatment plan hearings for Marcus or Ana in November and December of 2000. (Testimony of Angeline Doyle.)
Ms. R.'s contacts with DCF since October 1999 have also been sporadic. Often DCF would not know where she was until she called. Her whereabouts was unknown to DCF from September 15, 1998, to March 29, 1999, (Pet. Ex. 1 at 13) and again at the time of trial. DCF tried to get in touch with her at her last known address, where it had often contacted her in the past, to provide her with transportation to the court for the trial of this case, but was unable to locate her. The phone number at which DCF had called her in the past' was out of service, and a case aide sent to her last known address was unable to locate her. (Testimony of Angeline Doyle.)
Despite the court's directive that she avoid entanglement in the criminal justice system, Ms. R. was arrested for two misdemeanors on April 20, 1997, then failed to appear for those offenses on May 21, 1997. After being arrested for assault in the third degree and breach of peace of July 7, 1998, she failed to appear on these new charges, until being re-arrested. On November 5, 1998, she pleaded guilty to one count of failure to appear in the second degree in connection with the April 1997 arrests and to one count of assault in the third degree for the July 1998 CT Page 8649 incident. On the failure to appear charge, she was sentenced to time served; on the assault three charge, the court imposed a sentence of one year suspended, two years probation. On May 1, 1999, she was again arrested, for a charge of breach of peace, to which she pleaded guilty two days later and the court imposed a sentence of unconditional discharge.
DCF made several referrals to drug treatment programs to help Ana address her lifelong substance abuse problem. After a brief stay at the Alcohol Drug Recovery Center (ADRC) in April 1999 (Pet. Ex. 6), she left against medical advice. (Pet. Ex, 7 at 2.) Later that year, in December, DCF referred her for substance abuse treatment to the Institute for the Hispanic Family, which recommended that she participate in an outpatient psycho-education program, but after she missed three appointments, the Institute closed her case. (Id.) In March 2000 DCF then referred her to the Wheeler Clinic for a substance abuse evaluation. Wheeler recommended that she initially participate in a partial hospitalization program, five times a week for six weeks. (Pet. Ex. 12 at 4.) Although stating that she was agreeable to treatment, she attended the program only 15 out of the first 28 days, had positive substance abuse screens, for PCP on five occasions and for alcohol twice. Wheeler then referred her to the LifeLine program, which she agreed to attend five times a week. (Pet. Ex. 13.) Unfortunately, she immediately stopped attending any Wheeler program, and was discharged for inconsistent attendance and noncompliance in June 2000. (Testimony of Angeline Doyle.)
Although Ms. R. initially refused to attend parenting education classes (Pet. Ex. 1 at 11), despite the court's order that she do so, she later completed such classes at the Institute for the Hispanic Family. (Id. at 13.) The court also ordered Ms. R. to undergo individual counseling, but she stopped attending her individual therapy sessions in May 1998. (Id. at 11, )
C. THE RESPONDENT FATHER, RAUL R.
Raul R., the father of Ana Cristina, was born in Puerto Rico on September 21, 1973. The tenth of eleven children born to his parents, he was reared primarily by his father. Although his mother left home when he was very young, he saw her on numerous occasions as a child even though they lived in different households. He described his family to Dr. Silva as "supportive, warm, and close." Shortly after moving to the United States in 1990, he met the respondent mother. In 1993 she became pregnant with his child, Ana Christina. He told Dr. Silva that they separated after her family reported him to the police as fighting with her — although Mr. R. maintained that the charge was untrue. CT Page 8650
In September 1993 he was arrested for numerous felony charges; after being detained pretrial in lieu of $100,000 bond for eighteen months, on March 31, 1995, he was convicted of conspiracy to commit robbery in the first degree, a class B felony; kidnaping in the first degree with.a firearm, a class A felony; assault in the second degree with a firearm, a class D felony; and assault in the third degree. The total effective sentence imposed by the court that day was eighteen years, suspended after twelve years, five years probation. (Pet. Ex. 2 at 13.) Mr. R. was incarcerated when Ana Cristina was born in November 1993.
Mr. R. told Dr. Silva that he had spent time in drug-related activities such as talking about, buying and selling drugs. He denied to Dr. Silva that he had ever been addicted to drugs, Id., and his responses on the Substance Abuse Subtle Screening Inventory, which Dr. Silva administered, suggest "a low probability for a substance abuse problem." His responses to that objective test, however, indicate that he tended to respond to test inquiries "in a defensive manner, which increases the chances . . . that Mr. R. may in fact have a problem with drugs or alcohol. However, an elevated defensiveness score (DEF) may also indicate situational factors." (Pet. Ex. 2 at 13.) Such defensiveness makes him "somewhat at risk in future" for future drug usage. (Testimony of Dr. Eneida Silva.) While in prison, he took and on May 22, 2000, completed a program on addiction offered by department of corrections. (Resp. Ex. A.)
Since being sentenced in October 1973, Mr. H. has been incarcerated at various of the state's prison facilities. Since October 27, 2000, he has been housed at the Northern Correctional Institution, the state's "super-maximum" facility for inmates whom prison officials regard as a security risk to staff or other inmates, or who are housed there for public safety concerns. (Testimony of John Aldi.) Correctional Officer John Aldi, a "close custody counselor" at Northern, testified that Mr. R. had been transferred to Northern because prison officials identified him as a member of the Los Solidos gang and concluded that he was thus a threat to staff or other inmates. Aldi said he did not know the basis for DOC having identified Mr. R. as a gang member, but he testified that DOC had information, set forth in the margin, establishing that Mr. R. was either a member in good standing of Los Solidos or at least accepted by gang members.[7]
In his seven and one-half years of incarceration, Mr. R has a lengthy disciplinary history. He has received 25 disciplinary sanctions for such incidents as: interfering with safety and security (December 2000), attempted assault on a correctional employee (September 2000), assault on a correctional employee (April 1994), possession of contraband (dangerous instrument (Testimony of John Aldi)) (September 2000, May 2000, December 1998, April 1994), causing disruption (May 2000, December CT Page 8651 1996), fighting (January 2000, July 1994, December 1993), malingering (January 2000), assault (March 1997, January 1997), giving false information (October 1996), disobeying a direct order (December 1994, August 1994, March 1994, January 1994), theft (December 1994), being out of place (September 1994), and destruction of property (April 1994). (Pet. Ex. 3.)
Mr. R.'s current release date from prison is September 4, 2003. Aldi testified that Mr. R. will not get any good time credit, which, under various provisions of the general statutes,[8] may reduce a prisoner's sentence by more than one-third, unless he takes and completes some of the prison's gang programs. To be released before that, he would have to complete a "close custody" program at Northern; from Aldi's explanation of this program, it appears to be a program in which prisoners renounce any gang affiliation and prepare for living in the general prison population without a gang affiliation. The respondent has told prison officials he would like to participate in the program, but because of his last disciplinary violation in December 2000 he must wait until April 2001 to get on the list of people waiting to enter the program. If he does complete this program, his release date might be moved up to as soon as December 2002.
(Testimony of John Aldi.)
During the psychological evaluation conducted by Dr. Silva, Mr. R. expressed regret for his past mistakes and his intention to associate with different people in the future. (Pet. Ex. 2 at 13.) He told her that he had made wrong choices in terms of friends when he was younger and that having grown in a warm environment he should have known better. Similarly, his responses on psychological testing "indicated a great deal of regret regarding his previous errors." Dr. Silva wrote in her report that "[h]is regret and intentions appear genuine." (Id.) Yet Mr. R. has not translated any such intentions into socially and legally acceptable conduct while in prison. His prior criminal activity and prison disciplinary history show that he will need various supports in the community to avoid future criminal activity. (Id.) His past criminal behavior and prison conduct also suggest a substantial risk that upon his release he will live a criminal lifestyle posing a substantial risk to any young child in his custody of being injured or killed as a bystander to violence, or being exposed to behavior that would jeopardize her growth into a productive member of society.
While incarcerated, DCF has provided him with monthly visits with his daughter Ana Christina except during periods when DOC has suspended visitations as a penalty for a disciplinary violation. DCF has made up the visits missed during suspended visitations with additional visits, CT Page 8652 (Testimony of Rosalind McFadden.) Before his transfer to Northern CI, Mr. R. had contact visits with his daughter in which they could physically interact with each other. But since his transfer to Northern, a glass partition physically separates them during the visitations and they must communicate over a telephone; even so, the DCF case aide who transports Ana and supervises the visitations testified that Mr. R. does well in interacting with Ana considering the restrictions. (Testimony of Noel Perez.) DCF staff testified that during these visits he acted warmly and appropriately toward his daughter. (Testimony of Angeline Doyle and Noel Perez.) When not visiting her, he has frequently and consistently asked DCF staff about her well-being and status, and sent her cards, letters and gifts on birthdays and holidays. (Testimony of Rosalind McFadden and Angeline Doyle.)
Throughout his interview with Dr. Silva, Mr. R. "consistently expressed how much love he feels for his daughter, how the presence of his daughter in his life has changed his outlook about himself and his future. . . . Mr. R's demeanor and emotional expressiveness during the present evaluation suggested openness, a willingness to take responsibility for his actions, and a desire to be involved in his child's life." (Pet. Ex. 2 at 13.) Dr. Silva also conducted a parent-child interactional session between Mr. R. and Ana Christina. During the interactional session, "Mr. R. showed affection and love toward Ana, fair skills in setting appropriate limits, and emotional and physical availability for his daughter." (Pet. Ex. 2 at 12.) She concluded that he "is quite emotionally attached to his daughter, and appears as a warm and loving father" and that the potential for a relationship between the two was apparent. (Id. at 14.) Dr. Silva testified that Ana wanted to have a relationship with his father and that there is a potential for a relationship with them. Since he has been incarcerated since before Ana's birth and has had quite limited contact with his daughter, Dr. Silva observed that there was "some" but "not a great deal" of rapport between the two of them. She said that although Ana could interact with Mr. R. in a positive way, his limited contact with her over the years affected the interaction, which Dr. Silva believed went well in view of the lack of contact between them over the years. Dr. Silva's observation that Mr. R., in his one-hour interactional session with Ana Christina, was not proficient at setting limits with his daughter shows his inexperience in the role as a father and his limited parenting skills.
Mr. R. has never explained to DCF his plans for caring for Ana Cristina if the child is placed in his custody after his release from prison. He did suggest his brother, who lives in New York with his own wife and children, as a possible custodial resource, however. When DCF first tried to contact the brother, it did so in an English-language communication that got no response from the brother. After Mr. R. repeated his request CT Page 8653 that DCF consider his brother to Ms. Doyle, she was successful in reaching the brother. Mr. R.'s brother told her in March 2000 that he would not be able to come to Connecticut for an interview with her because of his work schedule until May 2000, when they finally did meet. When asked why he had then come forward, the brother said it was because Mr. R. had contacted him directly and asked him to do so. He told her that one of the reasons he and his wife had not contacted DCF earlier was that its inquiries had been in English and they had been unable to interpret the letter sent to them. Another reason had been that they had been on vacation and then busy after Mr. R. asked them to call.
After assessing the brother, Ms. Doyle concluded the brother and his wife were not suitable as caretakers for Ana because of the brother's conviction for drunk driving and resulting sentence of probation and because it had taken them so much time to respond to DCF inquiries. The DCF social worker testified at trial that although this family is Spanish-speaking, she believed they could have had the DCF letter translated. She also testified that the letter, which was not introduced into evidence, listed a telephone number that Spanish speakers might call and obtain translation — although she also admitted at trial that the first person answering such a call to that number might be an English language speaker, who would find someone to translate. Ms. Doyle testified that although the family had known Ana had been in foster care for more than three years it had waited to volunteer as a possible custodial resource; the social worker concluded that this delay in coming forward showed that the family lacked sufficient commitment to Ana to be an adequate custodial resource for her. (Testimony of Angeline Doyle.)
D. THE CHILDREN
 1. Marcus
Marcus was born on June 1992. Before his removal from his mother's home in 1997, he developed a close relationship with his sister, Ana Christina. After DCF obtained the OTC in 1997, it first placed him in a temporary foster, then, on March 18, 1997 (Pet. Ex. 1 at 4), with Pat R. (hereafter, referred to as Pat R.) with whom he has lived ever since. He has gotten along well there, although he misses his sister and his maternal cousins. (Testimony of Rosalind McFadden.) He has developed a loving, affectionate relationship with Pat R., whom he calls "grandmother" and he tells her he loves her. (Testimony of Angeline Doyle.) Dr. Silva noted in the interactional session that his foster mother was caring, nurturing, and appeared to be "a person who would be able to set limits when necessary." (Pet. Ex. 2 at 25.) His biological mother, the respondent, however, was slightly emotionally detached but available during her interactional session with Marcus and was not very CT Page 8654 attentive to him. (Pet. Ex. 2 at 18.)
While in foster care, Marcus has had behavior problems such as talking back to authority figures and having temper tantrums, which his current social worker, Ms. Doyle at trial identified as associated with his grief and sense of loss at being apart from his mother. (Testimony of Angeline Doyle.) At school, he has shown poor impulse control and poor anger management, problems which manifest themselves in disruptive classroom behavior, stealing, and physical aggression toward other students. To address these problems, DCF initially referred him to individual therapy and to family therapy with his mother and sister Ana. (Testimony of Rosalind McFadden.)
The initial psychiatric evaluation of Marcus established that he was the possible victim of sexual abuse and had a history of sexually reactive behavior toward his sister. (Pet. Ex. 11 at 1 and 2.) The family therapy lapsed after his mother was erratic and sporadic in providing transportation for the children. Id. DCF then took over the transportation and referred him to an extended day program through Village for Families and Children. DCF social worker McFadden testified at trial that the individual therapy and extended day program have both been helpful in addressing his problems. His behavior has improved and, in the words of Ms. McFadden at trial, is not consistently good or bad but has its "ups and downs," both in school and at home. He is occasionally referred back to the Village to address behavior problems at school and home. Pat R. sometimes feels overwhelmed at dealing with Marcus's problems, but she consistently calls DCF staff for help and to "vent" about his behavior. (Testimony of Rosalind McFadden.)
While in foster care, he has repeatedly mentioned missing his sister and maternal cousins. DCF has provided regular monthly visits between Marcus and Ana Christina, sometimes with their mother and sometimes only with themselves when their mother misses the visits. (Testimony of Noel Perez.) His mother's erratic and sporadic contact with him "tends to leave Marcus disillusioned and troubled" (Pet. Ex. 1 at 4) and exacerbates his disruptive behavior at school. (Pet. Ex. at 5.) A physician who conducted a psychiatric evaluation of Marcus on February 1, 2000, reported that "he is `too sad' to think about his mother and is relieved when he is reassured that he does not have to talk about it." (Pet. Ex. 11 at 4.) His behavior problems at school improved after his mother lost contact with him in early 1999, and then erupted again after she resumed contact with him. (Id. at 2.) Although he called the respondent "mother" during the psychological evaluations, and Dr. Silva noted that "there appears to be somewhat of a bond" between them, she also concluded that it is "perhaps not a very strong one." (Pet. Ex. 2 at 28, 32) On the other hand, as Dr. Silva noted, he is "clearly bonded" CT Page 8655 with his foster mother. Id. He has no memory of his father, whom he cannot identify or recognize. (Id.)
Marcus has done well in Pat R.'s family (Testimony of Dr. Eneida Silva, Rosalind McFadden, Angeline Doyle), despite some sibling rivalry with her other grandchildren. (Pet. Ex. 11 at 5.) She interacts well with him, is good at setting limits for him, yet is warm and loving toward him. She has dealt well with his behavioral problems and is good at guiding him when he is testing limits. She meets Marcus's need for stability and permanency. (Testimony of Dr. Eneida Silva.)
2. Ana Cristina
Like her brother Marcus, Ana Cristina is also troubled. Apparently sexually abused as an infant, she has shown both aggressive and sexualized behavior in her foster homes and at school. She is impulsive, inflicts injuries on herself, can be aggressive toward other children, and has a short attention span. One foster mother reported that she bit and scratched other children in the household and at preschool. As a result, she has had problems in both her foster homes and at school. (Testimony of Angeline Doyle.) In the first seventeen months after DCF removed her mother's care in February 1997, she had three different foster homes. In July 1998, however, DCF finally found a stable placement that could meet Ana Cristina's needs, in the home of Ms. Natividad M., in Bridgeport. (Testimony of Angeline Doyle and Rosalind McFadden.)
To address Ana Christina's behavior problems and sexual acting out, DCF has twice made therapeutic referrals for her. The first time was in early 1998, when social worker McFadden was assigned to the family's case and DCF was still working to reunify mother and children. Ms. Ana R. was going to therapy and DCF asked her to start taking Marcus and Ana as well. For reasons the evidence does not fully explain, this referral never actually happened, but after moving Ana to the Bridgeport foster home, DCF referred her to the child guidance clinic at Yale New Haven Hospital. Yale recommended weekly play therapy and a social skills group in the school setting. DCF then referred her to Stratford Child Guidance Clinic, where she was in treatment until a month before trial. That referral helped stabilize her moods to some extent but clinicians there recently diagnosed her as having reactive attachment disorder and needing specialized therapy, which DCF was at the time of trial attempting to secure.
After being placed in Bridgeport, Ana Cristina's behavior at school remained a problem; one teacher reported the following behavior in just one month: spitting, pulling other children's hair, stealing, destroying school property, leaving class without permission, hitting others, CT Page 8656 undressing, making sexually inappropriate remarks, choking another student, and lying. (Pet. Ex. 1 at 5.) In her foster home, however, Ana Cristina has done better. Ms. M. has done an excellent (in the words of Dr. Silva) and "exceptional" (in the words of Rosalind McFadden) job of caring for Ana. (Testimony of Dr. Eneida Silva and Rosalind McFadden.) She is committed to taking good care of the child, is patient with her, and actively involved in her therapy and school. (Testimony of Rosalind McFadden.) Dr. Silva testified that she was impressed with the way the foster mother handled Ana and that Ms. M. was able to direct Ana warmly in the way she needed to be guided and still maintain a good rapport with her. (Testimony of Dr. Eneida Silva.) Dr. Silva testified that Ana is clearly bonded with Ms. M., although someone such as Ana, who shows reactive attachment disorder, would ordinarily have difficulty bonding with their caretakers. (Id.) DCF social worker Doyle testified that Ms. M. has told DCF she is willing to care for Ana in long-term foster care but not to adopt her.
Prior to her transfer to Bridgeport, Ana saw her brother Marcus at least once a week. They are very close and she looked forward to and enjoyed her time with her brother. The distance between her new foster home Bridgeport and the location of her biological family and siblings in New Haven, however, reduced the frequency of her visits with them. Since then, instead of seeing Marcus weekly, she has seen him monthly. Social worker McFadden testified, however, that this distance did not cause a breakdown in her relationship with Marcus, as both foster mothers permit telephone contact between visits. Marcus and Ana remain close to this day in a loving sibling relationship. (Testimony of Rosalind McFadden.)
Because a recent assessment by her therapist recommended that Ana be placed in a home specially trained to deal with her problems, DCF is currently considering moving Ana from Ms. M.'s home to a therapeutic or professional foster home (Testimony of Ageline Doyle), a move that would be very disruptive emotionally for Ana because of her bonding to Ms. M. (Testimony of Dr. Eneida Silva.) Although both Dr. Silva and DCF social worker McFadden testified that Ana, like any child her age, needs permanency, Dr. Silva testified that someone with Ana's diagnosis would have difficulty trusting another environment or getting attached to another person and she said that she would hesitate to support a permanency plan that would move Ana from that foster home.
At age seven, however, after more than four years in foster care, Ana Cristina needs, as Dr. Silva testified, and the court finds this conclusion credible, a permanent and stable home and family sooner than Mr. Rodriguez's earliest possible release date, (Testimony of Dr. Eneida Silva.) CT Page 8657
3. Juan and Alexus
The two younger children in this matter, Juan and Alexus, have both been in the foster care of their paternal grandmother, Naomi C., since July 1997, where they have done fairly well. They have developed very loving interaction with their grandmother. (Testimony of Rosalind McFadden and Angeline Doyle.) They are very bonded to her and look to her to meet their psychological and day-to-day needs. (Testimony of Rosalind McFadden.) Both have significant developmental delays and have received services from the Birth to Three program. Both have made progress in their problems. Neither has any relationship with their mother. Other than the interactional evaluation conducted by Dr. Silva in July 2000, the last they had seen or heard from their mother was in February 1999 (with the next most recent visit three months previous, in November 1998.) (Pet. Ex. 1 at 5.)
At the parent-child interactional evaluation in July 1999 between Ms. R. and these two children, Alexus said "mommy" while pointing to the waiting room where the paternal grandmother was waiting. (Pet. Ex. 2 at 19.) In the interactional session with their grandmother, both Juan and Alexus called her "Mami." (Pet. Ex. 2 at 23.) Dr. Silva wrote in her report that "Juan and Alexus . . . made efforts to argue with Ms. R. that Ms. C. was their mother, and they did not seem to understand her interpretation that she was also a mother to them." (Id at 29.) Dr. Silva said there did not appear to be a strong bond between mother and children, although she did say that there were certain signs of the possibility of a stronger bond than was shown. (Id.) Dr. Silva found "a clear emotional bond between the children and Ms. C." (Id. at 24.)
 II — ADJUDICATORY DECISION
"Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the [statutory] grounds for termination of parental rights set forth in [§ 17a-112 (c)] exists by clear and convincing evidence. The commissioner . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . In re Eden F., 250 Conn. 674, 688-89, 741 A.2d 873
(1999)." In re Quanitra M., 60 Conn. App. 96, 102, ___ A.2d ___; cert. denied, 254 Conn. 903 (2000). "In the adjudicatory phase of a termination hearing, the trial court determines if one of the statutory grounds for termination of parental rights is proven by clear and convincing evidence. In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment." In re Tabitha P., 39 Conn. App. 353, 367, CT Page 8658664 A.2d 1168 (1995); Practice Book § 33-3(a). In the present case, the adjudicatory date is May 22, 2000, the date of the latest amendment to the petitions seeking termination of Mr. R.'s and Ms. R.'s parental rights.
As to the adjudicatory phase of this hearing of the petition for termination of parental rights, the court has considered the evidence and testimony related to circumstances and events following the adjudication of neglect on and until, when the TPR was filed.
A. LOCATION AND REUNIFICATION
To terminate parental rights for a non-consenting parent, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110[9] or section 17a-111b[10] that such efforts are not appropriate." General Statutes § 17a-112 (j) (1).
With respect to these statutory element of location and reunification, the court finds as follows by clear and convincing evidence the following:
1. Reasonable efforts to locate
The court finds by clear and convincing evidence that DCF made reasonable efforts to locate the respondent father, and did in fact locate him and serve him with process. Since the respondent mother failed to appear for trial in this court, the court has considered the evidence and record and finds by clear and convincing evidence that DCF made reasonable efforts to locate her. First, DCF obtained jurisdiction over her by serving her with the OTC order, the neglect petition, and the termination petition. In order to secure her presence for trial, DCF called and went to her last known address. In the context of a previously appearing party who has counsel, the court finds these efforts to meet the standard of clear and convincing evidence of reasonable efforts to locate.
2. Reasonable efforts to reunify
The petition seeking to terminate Ms. R.'s parental rights alleges that the court previously found at a hearing that reunification efforts were no longer appropriate. This court finds that on July 13, 1999, the CT Page 8659 court, Keller, J., found, after a hearing held pursuant to General Statutes §§ 17-17a-110 (b) and 17-17a-111b (b), that further efforts to reunify the children with the respondent mother was no longer appropriate.
The court finds by clear and convincing evidence that DCF took reasonable steps to reunify Ana Cristina with her father. It provided him with regular supervised visitation in the prison. When Ana exhibited behavior that had the effect of limiting the length of her visits with the respondent father at the prison, the DCF case aide took reasonable steps to address that conduct so they could get a full hour's visit. When he missed visits because of prison discipline, DCF made those visits up. Finally, DCF fairly considered his brother in New York as a placement resource and reasonably concluded, based on the brother's delay in contacting DCF after Mr. R. asked him to do so, that the brother was not sufficiently interested in or committed to providing care for Ana as to be a suitable caretaker. For an incarcerated parent whose repeated disciplinary infractions at the prison subjected him to frequent discipline, DCF could not have done much more. Thus, this court concludes that DCF has shown, by clear and convincing evidence, reasonable efforts to reunify Mr. R. with his daughter.
B. STATUTORY GROUNDS FOR TERMINATION
Trial of a petition to terminate parental rights has two phases, adjudication and disposition. To prevail in a non-consensual termination of parental rights case, DCF must prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In reMichael B., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied,247 Conn. 919, 722 A.2d 807 (1998); General Statutes § 17a-112 (j)(3). "In the adjudicatory phase of a termination hearing, the trial court determines if one of the statutory grounds for termination of parental rights is proven by clear and convincing evidence. In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment."In re Tabitha P., 39 Conn. App. 353, 367, 664 A.2d 1168 (1995); Practice Book § 33-3(a).
1. Failure to Rehabilitate
 a. Applicable Legal Standard
Section 17a-112 (c)(3)(B) of the General Statutes (now § 17a-112
(j)(3)(B)), as amended by Public Act 98-241, section eight, sets forth the statutory basis upon which the Commissioner relies in its petition against the respondents. As codified at the time the TPR petition was CT Page 8660 filed here and on the adjudicatory date, it provided in relevant part that
 The Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . that . . . the parent of a child who (1) has been found by the Superior Court to have been neglected or uncared for in a prior proceeding, or (2) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and such parent has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . .[11]
The court must determine whether the petitioner has proven, by clear and convincing evidence, that Ms. Ana R. and Mr. Raul R. had failed, as of the applicable adjudicatory dates, achieved the required degree of personal rehabilitation.
The term "rehabilitation" as used in the statute means "to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems." (Internal quotations omitted; internal citations omitted) In re Eden F., 250 Conn. 674, 706, 741 A.2d 873 (1999) "In assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In re Danuael D., 51 Conn. App. 829, 840, 724 A.2d 546
(1999). The statutory terminology "personal rehabilitation" thus requires the court to focus on the prospect of restoring a parent "to his or her former constructive and useful role as a parent." In re TabithaP., 39 Conn. App. 353, 361, 664 A.2d 1168 (1995). "What is a reasonable time is a factual determination that must be made on a case-by-case basis" depending on the needs and situation of the particular child. Inre Shannon S., 41 Conn. Sup. 145, 154, 562 A.2d 79, aff'd,19 Conn. App. 20, 560 A.2d 993 (1989).
In conducting the inquiry as to whether the commissioner has established a respondent's failure to rehabilitate by clear and convincing evidence, the trial court must consider: CT Page 8661
 • the respondent's rehabilitative status as it relates to the needs of the particular child and
 • whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child. "The statute requires the court to find by clear and convincing evidence that the parent's level of rehabilitation is less than that which would encourage a belief that he or she can assume a responsible position in the child's life within a reasonable time." In re Shyliesh H., 56 Conn. App. 167, 173, 743 A.2d 165 (1999).
"Thus, the trial court's inquiry requires the determination of both the present and past status of the child, and obtaining a historical perspective of the respondent's child caring and parenting." Id.
b. Claim that respondent mother has failed to rehabilitate
The crux of the adjudicatory ground of failure to rehabilitate is whether a parent has sufficiently addressed the problems and deficiencies in parenting that led to state intervention in the family so that the parent can, or will be able in the reasonably foreseeable future, considering the age and needs of the child, assume a responsible position in the life of the child. As the Appellate Court recently noted in In reSarah Ann K., 57 Conn. App. 441, 448 (2000), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." The evidence overwhelmingly demonstrates that the respondent mother, Ana R., had failed, by the adjudicatory date of May 22, 2000, to rehabilitate herself to the extent that she could then, or would be able in the reasonably foreseeable future, to care responsibly and adequately for any of these minor children, in light of their ages and needs.
In looking at the question of personal rehabilitation, the court must first consider the deficiencies in parenting that placed the children in jeopardy and led to DCF intervention in the first place. In this case, the presenting problems were drug usage, not feeding or caring for the children properly, a house that was filthy and had insufficient food for the children, and leaving them with inappropriate babysitters, and possible sexual abuse of Ana. (Testimony of Rosalind McFadden.) Ana's sexualized acting out in foster care and Marcus's sexualized advance to Ana both suggest to the court the possibility that they had been sexually abused, or exposed to sexual activities of others while in their mother's care. These are all signs of either a parent who did not care about her children, or who did not know how to care for them; regardless of which, she needed to take advantage of the many resources offered by DCF to help her learn how to care properly for her children. She needed to learn CT Page 8662 proper parenting skills, just as importantly, she also needed to develop the motivation, or will power, or determination, or other personal resources or attributes necessary for her to want and be able to apply those skills she might learn. This latter attribute required personal development and growth on her part, and thus the court ordered her to undergo counseling as part of the Expectations ordered.
Although she eventually attended parenting classes at the Institute for the Hispanic Family, she did not follow through on the individual counseling arranged by DCF and only attended sporadically the Sexual Abuse Counseling that DCF recommended for Marcus and her (Pet. Ex. 1 at 13.) She continued to be arrested and convicted for criminal violations despite a court-ordered expectation that she have no involvement with the criminal justice system. Her infrequent and sporadic contact with her four children, each of whom has specialized needs, could not possibly have provided her with sufficient information about their individual problems and needs. Her sporadic contact with DCF, her failure to follow through on individual counseling or complete substance abuse programs all prevented her from taking advantage of services the agency was offering to help her overcome her problems and regain custody of her children.
Drug use was also a key factor in DCF's first involvement with her family. Ms. R. has admitted using crack, PCP (a hallucinogen) and marijuana. Id. The evidence recounted above shows that she has not adequately addressed her drug problem, has never successfully completed a drug rehabilitation program, and continues to use illegal substances. In the weeks just before the adjudicatory date, she dropped out of the LifeLine Program offered by Wheeler Clinic and had positive drug tests on five occasions in March and April 2000. The court concurs with Dr. Silva's assessment that Ms. R.'s "tendency toward addictions is something that will strongly interfere in her ability to parent effectively and consistently." (Pet. Ex. 2. at 30.)
The court thus concludes that the evidence establishes clearly and convincingly that, as of the adjudicatory date of May 22, 2000, the respondent mother had failed to achieve the required degree of personal rehabilitation to care adequately for any of these children, in view of their needs and ages. The evidence further established clearly and convincingly that there was not reasonable prospect that she could or would, in the reasonably foreseeable future, be so rehabilitated.
c. Claim that respondent father Raul H. has failed to rehabilitate
The evidence presented at trial presented two starkly different portraits of the respondent father, Raul R. On the one hand, Dr. Eneida Silva, who conducted a psychological evaluation of Mr. R. and evaluated CT Page 8663 an interactional parent-child session between Mr. R. and Ana Cristina, said that he appeared to be remorseful for his previous mistakes, genuine in his claim to have learned from those mistakes, and loving, caring, and committed to his child. DCF also offered testimony that he was affectionate and acted appropriately toward Ana Cristina when visiting with her (testimony of Rosalind McFadden) and sent her cards and letters. (Id.)
On the other hand, the evidence also shows a man convicted of committing extremely serious felonies, kidnaping in the first degree with a firearm, robbery in the first degree, and assault in the second degree with a firearm. The length of his sentence, eighteen years suspended after twelve years, with five years probation, further testifies to the seriousness of the offenses he committed. From the nature of the offenses for which he was convicted and the length of the sentence imposed, Mr. R. obviously engaged in conduct causing a serious risk of harm to someone and used a firearm in doing so. While on the street before incarceration, he was involved in the use of drugs; during incarceration he has been associated with a prison gang. Furthermore, while in prison, he has committed more than 25 disciplinary violations, ranging from acts of violence to possession of contraband. Ten of those disciplinary violations occurred after he first appeared before the juvenile court in April 1997 on the neglect petition, eight since he first appeared on the termination petition in September 1999.[12] (Pet. Ex. 3 at 001-004.) Most of them occurred before the adjudicatory date of the petition here, May 22, 2000.
However well intentioned Mr. R. may be, however genuine his love for Ana Cristina and his regret at his past conduct, he has not translated those sentiments into less deviant behavior. His criminal activity before incarceration, conduct in prison, the disciplinary violations and gang association in prison all show someone who has difficulty living in accordance within socially acceptable bounds and the legal norms imposed by society.
The court finds it very significant that in discussing the conduct that led to his incarceration with Dr. Silva, Mr. R. minimized any wrongdoing on his part.[13] The path to rehabilitation usually leads through remorse. Remorse, Webster's Ninth New Collegiate Dictionary tells us, involves "a gnawing distress arising from a sense of guilt from past wrongs"; the dictionary gives as a synonym "self-reproach." The dictionary definition of "guilt" includes "a feeling of culpability for offenses." Dr. Silva wrote that his "demeanor and emotional expressiveness during the present evaluation suggested . . . a willingness to take responsibility for his actions." She also said that "he expressed how regretful he feels for his past mistakes . . . [and] his regret CT Page 8664 appear[s] genuine." (Pet. Ex. 2 at 13.) The court does not find her conclusions on this point credible. Nothing in Mr. R.'s description of his criminal conduct shows any sense of culpability on his part at all, any. "gnawing distress arising from a sense of guilt from past wrongs." Someone who does not understand or acknowledge the wrongfulness of conduct that led to a very severe prison sentence is not remorseful for that conduct, and such lack of remorse raises serious doubts as to whether he is a good candidate for being able to conform his conduct to the requirements of the law after his release from prison.
Moreover, despite his averments of love for his daughter and desire to be her parent, Mr. R.'s conduct in prison, even since the filing of the termination petition, has interfered with his ability to meet her needs as of the adjudicatory date, now or in the reasonably foreseeable future and effectively prevented him from being able to do so. On March 31, 1995, he received a sentence of eighteen years suspended after twelve years, five years probation. Prior to sentencing, he had been incarcerated pretrial in lieu of bond for 568 days, more than eighteen months (18.9 months of thirty days), since his arrest on September 31, 1993. (Pet. Ex. 4 at 2.) Under General Statutes § 18-98d (a),[14]
he was entitled to credit for that pretrial incarceration toward his sentence.
Furthermore, under the good time statutes, he was eligible to earn additional time off his sentence for good behavior during the first at the rate often days a month for the first five years of incarceration and twelve days a month for the balance of his sentence, or an additional 1, 608 days off the unsuspended twelve-year portion of his sentence. Pretrial credit and statutory good time might thus have reduced that twelve years by approximately six years (from the commencement of his pretrial incarceration). Moreover, under other statutes he had an opportunity to earn additional time off his sentence by working in the correctional institution[15] or by exceptional personal achievement, accomplishment and other outstandingly meritorious performance.[16]
The implication of these various statutory provisions affecting the amount of time that a person will be incarcerated in this case is that, had Mr. R.'s conduct in prison matched his protestations of remorse for his prior conduct, his claims of having learned from his past mistakes, or his expressions of desire to be a good parent for his daughter, he might well, either on the adjudicatory date or at the time of trial, have been out of prison and available to care for his daughter, or at leastmuch closer to release than he is now, having forfeited any good time. As a result, he would have had more and better opportunities to visit with his daughter, to develop further the relationship that Dr. Silva found both wanted. Had he been released, he have been able to establish a track CT Page 8665 record as to his ability to obey the law. In her testimony at trial, Dr. Silva had expressed concern that any relationship on Mr. R.'s part with the Los Solidos gang might expose Ana Cristina, upon his release, to the drug-related activities and violence that Dr. Silva associated with such gangs; had he been released earlier, Mr. R. would have been able to show whether these concerns were valid or a mere chimera.[17]
Instead, both at the adjudicatory date and at the time of the trial here, Mr. R., remained in prison, able to visit Ana Cristina only monthly, and even then he has missed visits in certain months when his visits were suspended because of disciplinary violations. Even though DCF has made up the missed visits with additional visits in other months, the fact remains that Ana Cristina lost opportunities, because of her father's conduct in prison, see him in certain months.
Since Mr. R.'s criminal activity prior to incarceration and his conduct in prison show an inability to conform to legally required norms of conduct, even upon release he would need to show an ability for a substantial period of time to live a law-abiding life that would not expose his daughter to criminally deviant behavior or lifestyle. His repeated violation of prison disciplinary rules increase the likelihood that, upon release, he will have difficulty conforming his conduct to the requirements of the law, thus violate the conditions of his release upon parole or probation, and consequently cause his daughter, should she have been placed in his care, to be ripped again from her caretaker. While his expressions of remorse and averments of future reform might reveal some potential, Mr. R. has not shown any history of living a responsible, substance-free and productive life as an adult in the outside world. Much like a recovering drug addict must show abstinence from drugs usage for a period of time for one to predict a reasonable prospect of continued abstinence, so Mr. R., in view of his conduct to date, would have to live crime-free for a considerable period of time after his release before the court could find a reasonable prospect that he would be able to maintain such a lifestyle.
The court thus finds that the petitioner has established, by clear and convincing evidence, that the respondent father, Raul R., had failed to rehabilitate himself to the point that he could, as of the adjudicatory date, the time of trial, or in the reasonably foreseeable future, considering the age and needs of his child, assume a responsible position in Ana Cristina's life. His conduct in prison shows an inability to conform to socially acceptable norms. His criminal activity that caused his incarceration and his conduct in prison have prevented him from being available to meet his daughter's needs now or in the reasonably foreseeable future. His current release date is September 4, 2003, more than two years hence. Although his attorney ably elicited in CT Page 8666 cross examination of correctional officer Aldi that, should Mr. R. participate in certain gang-awareness programs, his release date would accelerate to somewhere between December 2002 and September 2003, such an earlier release is still more than a year away. Even after his release, he would have to life crime-free for a period of time before he would have shown himself able to maintain a law-abiding lifestyle and to be a suitable caretaker for any child.
The testimony established that Ana Cristina, at age seven, having been in foster care for more than three years, with a psychiatric disorder that makes it difficult to form close attachments yet having bonded closely with her present foster mother, needs stability and permanency in her life before her father will be available to meet her needs. It would be detrimental to her to wait for her father until his release from prison for him to show whether he could be a suitable caretaker for her.
2. Abandonment
 a. Applicable Legal Standard
The petitioner has asserted, as one of the statutory grounds for terminating the parental rights of Ms. Ana R. that she abandoned her children. Section 17a-112 (j) of the General Statutes provides that:
 [t]he Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . (3) that: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . .
"Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes [Rev. to 1995] § 17a-112 (b)(1) [now § 17a-112
(j)(3)(A)] defines abandonment as the [failure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . ." In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122
(1993).
The statute requires DCF to show by clear and convincing evidence that CT Page 8667 a parent has failed to maintain a reasonable degree of interest in the welfare of his or her child. "Maintain implies a continuing, reasonable degree of concern" not "a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child." "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. . . ." (Internal quotation marks omitted.) Id.
b. Abandonment claims as to respondent mother
 i) Juan and Marcus
In considering the question of abandonment the court must decide whether the evidence establishes clearly and convincingly that, as of the adjudicatory date of May 22, 2000, Ms. R. had abandoned her children. The evidence presented at trial establishes clearly and convincingly that the respondent mother had abandoned Juan and Alexus as of that date. She had failed to maintain reasonably contact with them and had not even seen them since July 1998, despite the fact that DCF and the paternal grandmother allowed unscheduled, open-ended visitation with them. Since the last date of direct contact with these two children, she has not made any efforts to communicate or have contact with them indirectly, by way of making telephone calls or sending cards, letters or gifts. Even before losing contact with them, she was sporadic in her visitation, often missing scheduled sessions with her children. Nor has she shown interest in the children or their welfare by contacting DCF to inquire about them. This lack of contact with or interest in these children evinces a complete disregard and lack of concern for their welfare. In re KeziaM., 33 Conn. App. 12, 17-18, 632 A.2d 1122 (1993). Her conduct exhibits none of the "minimum attributes" identified by In re Kezia M., supra,33 Conn. App. 17-18, of a parent toward Juan or Alexus. DCF has proven by clear and convincing evidence that Ms. R. has abandoned these two children, within the meaning of General Statutes § 17a-112 (j)(3) (A), by her failure to maintain a reasonable degree of interest, concern or responsibility as to their welfare.
ii) Ana Cristina and Marcus
The court does not find, however, clear and convincing evidence that the respondent mother had abandoned either Ana Cristina or Marcus as of the adjudicatory date. In May 2000, DCF was still providing, and she was still attending, monthly visitations with these two children, albeit CT Page 8668 sporadically. Although DCF social worker McFadden testified that to her knowledge Ms. R. had not seen Ana or Marcus since the summer of 1998, her knowledge was clearly incomplete, as DCF social worker Doyle later testified that Ms. R. was visiting her children as late as the year 2000, albeit with interruptions. Thus, having found Ms. McFadden's knowledge of the contacts between Ms. R. and Ana and Marcus incomplete, the court does not credit her testimony that Ms. R. has not sent Ana or Marcus cards or letters since the summer of 1998. And although social worker Doyle testified that Ms. R.'s contact with Ana and Marcus had been sporadic since she got the family's case, and that Ms. R would be available at some times and not at other times, she also testified that until August 2000 Ms. R. was still having some visitation with these children and would call every once in a while.
While it is clear that sporadic contact does not defeat a claim of abandonment; In re Shane P., 58 Conn. App. 244, 256, ___ A.2d ___ (2000); In re Migdalia M., 6 Conn. App. 194, 210, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986); since Ms. Doyle's testimony about the contacts between Ms. R. and Ana and Marcus referred to the entire time she has had the case, from October 1999 through the date of trial in March 2001, the evidence does not provide sufficient detail as to the frequency, degree and nature of her contact with the children in the period prior to the adjudicatory date of May 22, 2000. Accordingly, the court concludes that the petitioner has not established by clear and convincing evidence that the respondent mother had, as of the adjudicatory date, abandoned Ana and Marcus.
3. No Ongoing Parent-Child Relationship
 a. Applicable Legal Standard
The remaining statutory ground alleged for termination is the petition's allegation that there is no ongoing parent-child relationship between the respondent mother and father and their children pursuant to General Statutes Section 17a-112 (1)(3)(D), which establishes as an adjudicatory ground for termination of parental rights where:
 there is no ongoing parent-child relationship, which means the relationship-that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child;. . . . CT Page 8669
Under this section, the court must "undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop." In Re John G.,56 Conn. App. 12, 22, 740 A.2d 496 (1999). "In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent." (Citations omitted.) In re John T., supra at 23. This standard contemplates a relationship that has some positive attributes. In reJessica M., 217 Conn. 459, 470, 586 A.2d 597 (1991). To satisfy the second prong [of the analysis], the trial court was required to determine whether it would be in the child's best interest to allow additional time for the establishment of a parent-child relationship . . . The "best interest" standard, therefore, does not become relevant until after it has been determined that no ongoing parent-child relationship exists. (Citation omitted.) In re Kezia M., 33 Conn. App. 12, 22, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993). The factors to be considered in deciding whether it would be in his best interest of a child to permit further time for a relationship with his parent to develop include (1) the length of stay with the foster parents, (2) the nature of the child's relationship with the foster parents, (3) the degree of contact maintained with the natural parent and (4) the nature of the child's relationship to his or her natural parent. Id.
b. Claim that mother has no ongoing parent-child relationship
 i) As Juan and Alexus
The evidence established by clear and convincing evidence that as of the adjudicatory date the respondent mother had no ongoing parent-child relationship with either Juan or Alexus. By May 22, 2000, she had no contact with them for almost two years, since July 1998, when Juan was almost three years old and Alexus almost two. Two years is a long time in the lives of children that age. As the parent-child interaction of July 2000 showed, they did not, by that point, even perceive or recognize that Ms. R. was their mother. They had virtually no positive feelings about her, as a parent, and no parent-child bond with her. That is natural, given the fact that for two years their paternal grandmother, whom they call "Mami," had been caring for them. Moreover, in view of the ages of these two children; the length of time they have been in foster care, and their urgent need for permanency and stability now, the court finds that it would be detrimental to the best interest of each child to give Ms. R. more time for such a relationship to develop or renew. CT Page 8670
ii) As to Ana Cristina and Marcus
"In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent." (Citations omitted.) In re John G., 56 Conn. App. 12,23, 740 A.2d 496 (1999). Contrary to the allegations of the state's petition, the evidence does not establish lack of an ongoing parent-child relationship between Ms. R. and either Marcus or Ana Cristina.
With regard to Ana Christina, the evidence shows that in the year 2000 Ana would get very excited to see her mother when the DCF case aide would pick her up to transportation her to Hartford for visits with her mother. (Testimony of Noel Perez.) In the parent-child interactional assessment conducted by Dr. Silva on July 17, 2000, both Ana and Marcus "sought their mother's attention and direction and appeared to be happy with her." (Pet. Ex. 2 at 18.) Ana referred to Ms. R. as her mother during the evaluation, which Dr. Silva interpreted to mean that she had "somewhat of a bond" with her mother. (Id. at 28.) Dr. Silva's concluding remarks in her report stated that "Ana expressed positive feelings" for her mother. (Id. at 32.) On this record, there is insufficient evidence to meet the standard of clear and convincing proof of no ongoing parent-child relationship between Ana and her mother.
With regard to Marcus, there is admittedly less evidence of a positive relationship with his mother. There is no evidence that he looks forward to seeing his mother. He did not express the same level of positive feelings toward his mother in the psychological assessment as his sister, Ma. Dr. Silva remarked that although Marcus referred to Ms. R. as his mother, he seemed only "somewhat attached to mother, but not to a very significant degree." Id. On the other hand, Marcus seemed disappointed that his mother did not join in his interactional session with his foster mother. (Id. at 30.) The sibling rivalry between Ana and Marcus that Dr. Silva detected in the interactional session with their mother; Id. at 18; suggests a desire on Marcus's part for her love and attention. Such an inference is consistent with the fact that he, like his sister, sought his mother's attention and direction during the session and appeared happy with her. Id. While this evidence thus does not contain as much positive evidence of an ongoing parent-child relationship between Ms. R. and Marcus as between Ms. R. and Ana, the burden of proof on this element does not fall on the respondent but the petitioner. The evidence as to "no ongoing parent-child relationship" between Marcus and his mother is sparse.
While the psychiatric evaluation conducted of Marcus in February 2000 by Dr. Mangini for the Village for Families and Children reported that, CT Page 8671 according to the foster mother (whose reliability there does not appear any reason to doubt), Marcus's behavioral acting out at school had improved during a period of no contact with his mother and again became a problem when contact resumed (Pet. Ex. 11 at 2), the petitioner offered no evidence to allow the court to interpret this behavior. Did it represent negative feelings toward the respondent mother, or anxiety over waiting to see her between visits? The court can only speculate as to the answer. There is no testimony of a professional psychologist here, as there was in In Re John G., 56 Conn. App. 12, 22, 740 A.2d 496 (1999), that no ongoing parent-child relationship had been observed, or, as in Inre Savanna M., 55 Conn. App. 807 (1999), that the child psychologist had found no present positive memories of the parent, or even, as in In reTabitha T., 51 Conn. App. 595, 602, 722 A.2d 1232 (1999), that the children "did not wish to return to mother's care, now or in the future."
While this court is not holding the petitioner to a requirement that expert testimony is necessary to prove an allegation of no ongoing parent-child relationship, it must nonetheless offer clear and convincing proof to meet the statutory standard. The evidence, to the contrary, suggests that despite the sporadic and lackluster efforts of the respondent mother to visit her children or maintain contact with them, the length of time they have been out of her care, and their obvious bonding to their foster parents, both Ana and Marcus continue to harbor some positive feelings toward their mother. The statutory standard requires proof of no present positive parent-child relationship. The evidence here shows, as Dr. Silva said, "somewhat of a bond" albeit "perhaps not a very strong one." (Pet. Ex. 2 at 28.) Such evidence does not meet the requirements of the statute to terminate a Ms. R.'s parental rights under General Statutes § 17a-112 (j)(3)(D) as to either Ana Cristina or Marcus.
 c. Claim that respondent father Raul H. has no ongoing parent-child relationship with Ana Cristina
Deciding whether the petitioner has proven no ongoing parent-child relationship between Mr. R. and Ana Cristina again requires the court to weigh substantially conflicting evidence. Dr. Silva's conclusions that Ana has a bond with her father and wants a relationship with him are flatly contradicted by the testimony of DCF case aide Noel Perez, who transports Ana Cristina to and from the prison to visit her father. Before and during those prison visits, Ana Cristina has shown behavior that can only be interpreted as trying to avoid or shorten the visits. When Perez shows up at her foster home to transport her for a visit, Ana Cristina will ask whom she is going to visit that day. If Perez says she will visit her mother, Ana will be excited and happy; if the case worker CT Page 8672 says they are going to visit her father, she will say she does not want to go. After arriving at the prison, she has undertaken various stratagems to shorten the visits, such as saying she had to go to the bathroom, or was tired or hungry. When the case aide has tried to address these problems by making sure that the foster mother has prepared a meal for the trip, and that Ana Cristina has used the toilet before the visit began, she will start jumping around during the visit and becoming disruptive so that a guard ends the visit.
On cross-examination Perez acknowledged that Ana's biggest expressed complaint seemed to be the length of the car ride from Bridgeport to near the Connecticut-Massachusetts border, where Osborne and the Northern prisons are located. It is not unusual, he said, for children not to want to take such long car rides, even to visit parents from whom they are separated. The court notes, however, that Perez also testified that Ana would not complain about the length of a car ride from Bridgeport to Hartford to visit her brother or mother. While he also said that no child would last very long in a visitation in the confined setting of Northern prison, communicating only on a telephone across a glass barrier, he also testified that such a setting, rather surprisingly, did not seem to affect or scare Ana Cristina. (Testimony of Noel Perez.) The court further notes that in her one-hour interactional session with Mr. R., Ana also asked twice to leave the room to go to the bathroom, although she did not do so once in interactional sessions of similar length with her mother or foster mother. (See Pet Ex. 2 at 15-20.)
This conflicting evidence requires the court to weigh the relative credibility of the two witnesses. It is the role of the trier of fact to decide the weight and credibility to be afforded expert witnesses. "`In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony.' Kimberly-Clark Corp. v. Dubno, 204 Conn. 137, 153,527 A.2d 679 (1987)." Jacques All Trades Corporation v. Brown,42 Conn. App. 124, 129, 679 A.2d 27 (1996). The trier may accept all, part or none of an expert witness's opinion, as it may of the testimony of any witness. "It is the quintessential function of the finder of fact to reject or accept evidence and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert." (Citation omitted.) Tartaglino v. Dept. ofCorrection, 55 Conn. App. 190, 195, 737 A.2d 993, cert. denied,251 Conn. 929, 742 A.2d 364 (1999). "[T]he trier of fact is not required to believe unrebutted expert testimony, but may believe all, part or none of such unrebutted expert evidence." Bancroft v. Comm. of MotorVehicles., 48 Conn. App. 391, 405 710 A.2d 807 (1998). "In weighing the testimony of an expert, the trier of fact may accept part of the testimony of an expert without being bound by all of the opinion of the CT Page 8673 expert." Johnson v. Healy, 183 Conn. 514, 517, 440 A.2d 765 (1981), quoting United Aircraft Corporation v. International Assn. of Machinists,169 Conn. 473, 490, 363 A.2d 1068 (1975), cert. denied, 425 U.S. 973,96 S.Ct. 2172, 48 L.Ed.2d 797 (1976).
Nothing in this conflicting evidence credibly showed a "parent-child" relationship, as defined by the legislature and construed by our courts, between Mr. R. and his daughter. The statutory definition of a parent-child relationship is one that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child. Mr. R. has never met any of Ana Cristina's day to day needs, as he has been incarcerated since before her birth. Our Supreme Court has recognized the ambiguity of the statutory definition "when applied to noncustodial parents [such as the respondent father here] who must maintain their relationships with their children through visitation." In re Jessica M., 217 Conn. 459, 467-68,586 A.2d 597 (1991). It has resolved that ambiguity by interpreting the statutory language of "no ongoing parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." Id. at 468. In assessing this relationship, the court must "consider the feelings of the child toward the parent, especially if those feelings are positive rather than negative." In Re Megan M., 24 Conn. App. 338,341, 588 A.2d 239 (1991) Some of Dr. Silva's conclusions, if credited selectively, might support an inference that Ana Cristina harbors positive feelings for her father. Her conclusions, however, were neither unequivocal nor clear-cut. She acknowledged in her testimony that they had some rapport during their visit, but not a great deal of it; she noted that Ana Cristina could interact with Mr. R. in a positive way, but the fact he had not been there for her in her life until visitation started in this case had clearly had some impact on their interaction. She also reported that Ana Cristina showed some anxiety regarding being with Mr. R. (Id at 29.) Her report states that it is unclear if placement with Mr. R. would be in Ana's best interest since she needs a great deal of structure and limit setting (Pet. Ex. 2 at 31); and he had relatively little success in setting limits for her during their interaction. (Testimony of Dr. Eneida Silva.) The court therefore concludes, from the totality of the evidence, that Ana Cristina does not harbor positive feelings toward Mr. R. as a parental figure.
Nothing in her report or testimony, moreover credibly supports her further conclusion that such feelings represent a bond, or a conclusion that a parent-child relationship, as opposed to a visiting relationship, exists. In fact, Dr. Silva herself recognized that it was "unclear CT Page 8674 whether Mr. R. is Ana's psychological parent." (Pet. Ex. 2 at 29.). At trial, Dr. Silva described what the court finds as the most telling and persuasive description of the interaction between Mr. R. and Ana Cristina — that there is a potential for a relationship between the two. Yet a potential for a relationship does not show a present parent-child relationship. The evidence instead shows this to be a visiting relationship that has not yet matured to the level of a parent-child relationship.
In view of such potential for a parent-child relationship here, the court must thus assess whether "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child" as required by the second portion of the no ongoing parent-child relationship statute, Ana Cristina's need for stability and permanence override any benefit that might otherwise inure from continuing to allow this relationship with her father to develop. This court has already found credible the testimony of Dr. Silva that this young child needs her permanency status resolved sooner than Mr. R. can be released from prison. Ana Cristina cannot wait for such a relationship to develop, particularly since she has such a well-founded, nurturing, supportive bond with her current foster mother. The court accordingly finds by clear and convincing evidence that there is no ongoing parent-child relationship between Ana Cristina and her father and that allowing more time for such a relationship to develop would be detrimental to her best interest.
 III — DISPOSITION
"If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child," (Citation omitted; internal quotation marks omitted.) In re Roshawn R., 51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In making the dispositional decision in a non-consensual case, "the court is mandated to consider and make written findings regarding seven factors" specified in General Statutes § 17a-112 (k).[18] In reTabitha P., 39 Conn. App. 353, 664 A.2d 1168 (1995). Unlike the adjudicatory phase, on disposition the court may consider information through the close of the evidentiary hearing. Practice Book § 33-5. In the dispositional phase of this case, the court has considered the evidence and testimony related to circumstances and events up to and including March 13, 2001, the date upon which the evidence in this matter was concluded.
A. REQUIRED STATUTORY FINDINGS.
The court makes the following written findings, as required by General CT Page 8675 Statutes § 17a-112 (k). The court has considered these factors and its findings in determining whether it is in the best interests to terminate the parental rights of Mr. Raul R., and Ms. Ana R. In reQuanitra M., 60 Conn. App. 96 (2000), cert. denied 255 Conn. 903 (2000).
 1. The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent — § 17a-112 (k)(1)
The court finds that DCF offered timely and appropriate services to the respondent mother to facilitate her reunion with her children. It offered referrals to substance abuse evaluation and treatment to address her drug addition, to parenting classes to help her learn better how to care for her children, and to individual counseling to help her address her general personal problems. It referred her and her child Marcus to sexual abuse counseling to help Marcus address his sexualized acting out. It has provided transportation for her and her children to and from visits with each other and offered unlimited open-ended visitation with Juan and Alexus, who live with their father's mother.
The court finds that DCF offered timely and appropriate services for the respondent father, Raul R., to facilitate his reunion with Ana Cristina. The service DCF provided was the only one that it could — regular visits transporting Ana Cristina to and from the prison where Mr. R. was incarcerated. As part of the visitation, DCF staff made reasonable efforts to address behavioral roadblocks the child put up to shorten those visits.
 2. Whether DCF of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended — § 17a-112 (k)(2)
The court finds that DCF made reasonable efforts to reunite Ms. R., with her children. It provided the services she needed to address the problems that had led to their removal from her custody.
The court finds that DCF made reasonable efforts to reunite Mr. R. with Ana Cristina, by providing transportation for her visits to the prison and trying to address conduct on the child's part that cut short some of those visits.
 3. The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to. which all parties have fulfilled their obligations under such order § 17a-112 (k)(3) CT Page 8676
On June 12, 1997, the court, D'Addabbo, J., ordered that Ms. R. comply with the following expectations.
 • Keep all appointments set by or with DCF. Ms. R. often missed appointments with DCF workers or for visitations with her children.
 • Keep whereabouts known to DCF, and your attorney. Ms. R.'s whereabouts was unknown from September 15, 1998, to March 29, 1999, and again in the months immediately preceding and up until the time of trial, She did not keep in contact with attorney, either. On November 15, 1998, Frank Twohill, Ms. R's attorney reported that he had not seen her in two months and was not aware of her whereabouts. (Pet. Ex. at 9-10.) At trial, Attorney Twohill reported to the court he had not seen or heard from his client since 1999.
 • Visit children as often as DCF permits. Ms. R was initially permitted to have weekly unsupervised visits with Marcus and Ana Cristina. The unsupervised visits were halted June 24, 1998, due to a substantiated report of physical abuse of Ana Cristina by mother during an unsupervised visit. She was then offered weekly visitation with Marcus and biweekly visitation with Ana Cristina. (Pet. Ex. 1 at 11.) After that she saw Ana and Marcus only sporadically. (Id., testimony of Rosalind McFadden and Angeline Doyle, ) She saw Ana only once, in the summer of 1998, through the end of 1999. (Testimony of Rosalind McFadden.). When social worker Doyle took over the case, she arranged monthly visits for Ms. R. with Ana and Marcus, but after the respondent missed several visits, they were discontinued. Her last visit with them was in August 2000. (Testimony of Angeline Doyle.) DCF allowed her unlimited, open-ended visitation with Juan and Alexus, but her last visit with them was in the summer of 199 (Pet. Ex. 1 at 11, testimony of Rosalind McFadden and Angeline Doyle.)
 • Participate in parenting, individual, family, and drug/alcohol counseling re history of sexual abuse and follow recommendations of providers. Ms. R. partially complied with this expectation. After initially refusing to participate in parenting classes because she said she believed she did not need them, the respondent took and completed a class on parenting skills at the Institute for the Hispanic Family. Although referred to therapy for sexual abuse with Marcus she attended sporadically from September 1996 to January 1999, the provider closed that referral due to noncompliance as a result of her non-attendance. (Pet. Ex. 1 at 13.) Because she saw the children so infrequently, the court cannot assess whether this course helped improve her parenting skills. Although the evidence did not establish if Ms. R. was ever formally CT Page 8677 discharged from individual therapy to which DCF referred her, she stopped attending attended therapy in May 1998. She was referred to but did not successfully complete individual counseling or substance abuse counseling and treatment.
 • Submit to random urine screens. The record did no disclose if DCF ever required her to undergo random drug testing other than as part of the substance abuse treatment programs to which it referred her. The drug testing conducted on Ms. R. in those programs showed positive results for drug usage on several occasions.
 • Accept in-home services as referred by DCF. No evidence was offered as to which of the referrals provided by DCF were for in-home services. Earlier, in 1995, DCF had offered VNA services and St. Francis Parent Aid, but both were discontinued because of Ms. R.'s noncompliance. (Pet. Ex. 1 at 12.)
 • Sign releases as requested. In general Ms. R. was compliant with this expectation when she remained in contact DCF. Because her contact with DCF was sporadic, DCF often had difficulty obtaining timely releases of information. (Pet. Ex. 1 at 12.)
 • Secure and maintain adequate housing and legal income. Ms. R. was homeless for a portion in March 1999. Other times DCF was unable to verify whether she had an apartment. (Pet. Ex. 1 at 12.)
 • No substance abuse. Ms. R. did not comply with this expectation. Reports admitted into evidence showed drug usage on several occasions in the year 2000.
 • No involvement with the criminal justice system. Ms. R. did not comply with this expectation. She was arrested on July 24, 1998 and charged with assault in the third degree.[19] She was convicted of that offense and received a sentence of one year suspended, two years probation on November 5, 1998. She was arrested again on May 1, 1999, and disposed of that charge with a conviction and sentence of unconditional discharge two days later.
The evidence and court file do not reflect that the court ever entered orders or expectations with regard to the respondent father, Raul R.[20]
 4. The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties — § 17a-112 (k)(4) CT Page 8678
Marcus has developed a loving, affectionate relationship with his foster mother, Ms. Patricia R. (Testimony of Rosalind McFadden) He refers to her as his grandmother, his relationship to her is like that of son to mother, and he seeks her for comfort and to meet his daily needs. (Testimony of Angeline Doyle.) He has a clear emotional bond with her. (Pet. Ex. 2 at 29.) He has somewhat of a bond with his mother, but one that is no longer very strong. (Id. at 28.)
Ana Cristina, despite her reactive attachment disorder, has developed a clear emotional bond with her foster mother that is important and positive for Ana. (Pet. Ex. 2 at 29; Testimony of Dr. Eneida Silva.) She has also developed a visiting relationship with her father. She also loves and cares about her mother.
The two younger children, Juan and Alexus, no longer recognize the respondent mother as their mother. (Pet. Ex. 2 at 28; Testimony of Dr. Eneida Silva.) They refer to their foster mother, their paternal grandmother, as "Mami" (Pet. Ex. 2 at 23), with whom they have very loving interaction. (Testimony of Dr. Eneida Silva.) They have a "clear emotional bond" with theirs foster mother. (Id. at 24.)
5. The age of the child — § 17a-112 (k)(5)
Marcus, born June 1992, was eight years old at the time of trial, and nine years old at the time of this decision. Ana Cristina, born November 1993, is seven years old. Juan, born October 1995, is now five years old. Alexus, born October 1996, is four years old.
 6. The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child — § 17a-112 (k)(6)
The respondent mother, Ana R., has done very little to adjust her circumstances of conduct to make it in the best interests of her children to be reunited with her. She continues to abuse narcotic substances. She has not dealt with her major problems. She has not maintained contact with the children.
The respondent father has made efforts to maintain contact with his CT Page 8679 daughter. His attorney filed a motion to require DCF to require visitation when the neglect case began and DCF opposed visitation?[21]
He is loving and appropriate in his interactions with his daughter. Unfortunately, his own conduct has thwarted his ability to make it in the best interest of Ana Cristina to be united with him; by committing such serious offenses in 1993, and then repeatedly violating prison disciplinary rules, Mr. R. has engaged in conduct that has resulted in his isolation and separation from his daughter.
 7. The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent — § 17a-112 (k)(7).
There is no evidence that any unreasonable act of any person has impaired or prevented either respondent parent from developing or maintaining a meaningful relationship with their children, or that economic circumstances have played any role in preventing the maintenance of such a relationship.
B. BEST INTERESTS OF THE CHILD — § 17a-112 (j)(2)
The court is next called upon to determine whether termination of the parental rights of would be in the best interests of the child.[22] From the evidence offered at trial, the court finds by clear and convincing evidence, for the reasons stated, that it is in the best interest of each minor child at issue in this proceeding for the paternal rights of their biological mother and fathers to be terminated.
1. Marcus
The best interest of Marcus is for him to have stability and permanence as soon as possible. He has lived in foster care with the same person for more than four years. He is closely bonded to her, and she meets his needs. His foster mother intends to adopt him if the court grants this petition; as a result, he would have the stability and permanency in a relationship and setting that meets his needs and with a caretaker who has done well at meeting his needs, despite his many problems. His mother, the respondent, Ana R., cannot meet his needs now or in the reasonably foreseeable future. When his foster mother finds it difficult to cope with Marcus, she reasonably seeks help and resources. (Testimony of Ageline Doyle.) He needs to feel support and guided, and is receiving that nurture in his foster setting. (Testimony of Dr. Eneida Silva.) The court finds credible the conclusion of Dr. Silva, buttressed by the observations and testimony of the DCF social workers, that it would be a CT Page 8680 positive development in Marcus's life should he be adopted by Pat R.
2. Ana Cristina
Ana Cristina is a young girl with many needs and problems. Since July 1998, she has lived with Ms. Natividad M., a foster mother who has done an exceptional job of meeting her needs and with whom Ana has developed a very close bond. Although Dr. Silva testified that Ana Cristina wants to maintain a relationship with her father, the court does not find Dr. Silva's testimony on that point credible. The evidence about Ana's avoidance behavior to shorten her visits makes it clear that Ana does not want to attend the visits and tries to shorten them, evidence that clearly negates any inference or conclusion that she is bonded to Mr. R.
Moreover, even though Dr. Silva concluded that it would be in Ana Cristina's best interest to continue seeing her father, this court does not accept her opinion testimony of this point as credible or well-founded. Whether Mr. R.'s expressions during his court-ordered psychological evaluation of regret for his past conduct and of intent to change his behavior were dissembling that deceived Dr. Silva or represent a disconnect between feelings and conduct does not affect this court's conclusion as to his inability, either as of the adjudicatory date, at the time of trial, or in the reasonably foreseeable future, to care to Ana Cristina, in light of her age and needs. Dr. Silva's written report carefully couched her assessment that Mr. R. was genuine in his remorse in terms of "it appears." Testifying at trial she was less qualified — saying that her "general impression" was that he was quite remorseful of past and really wanted a fresh start; yet even at trial Dr. Silva was careful to say that she had concerns about his past involvement in crime in terms of his parenting. My "regret" he may express has not shown itself to be remorse or awareness that what he did was wrong. And, as indicated above, he has not translated any feelings of regret he has about his prior lifestyle into his behavior while in prison.
The court thus rejects Dr. Silva's statement in her written report that it "appears to be in the best interest of Ana to continue to have ongoing and regular contact with her father." (Pet. Ex. 2 at 14.) At trial, moreover, Dr. Silva qualified that conclusion by testifying about Ana Cristina's need for permanence. When asked whether Ana Cristina could wait until Mr. R.'s release from prison in 2003, Dr. Silva testified that even waiting for him until 2002, which correctional Aldi testified would be his earlier release date even if Mr. R. participated in prison gang awareness programs, would be too long for Ana Cristina to wait for stability and permanence in her life. (Testimony of Dr. Eneida Silva.) In view of Ana's needs for permanency and the uncertainty about whether or CT Page 8681 when her father would be able to be a suitable caretaker, the court has concluded that it is in her best interest that Mr. R.'s parental rights be terminated.
Whatever Ana Cristina's feelings for her father, this young child has needs for stability and permanence in her life that must be met sooner than Mr. R. will be available. Removing her from Natividad M.'s care and custody now would be emotionally harmful to her, That bond with her foster mother will only strengthen over time. As neither her mother nor her father can meet Ana Cristina's needs now or in the reasonably foreseeable future, it is in Ana Cristina's best interest to terminate each of her parent's legal rights as a parent. Ana's age and needs dictate a stable, permanent placement sooner than either can possibly be available for her. There is no evidence, moreover, that the respondent father has any skill or knowledge about how to care for a child with the needs and challenges that Ana brings to her caretaker. She is his only child. He has been incarcerated since age twenty, for most of his adult life, and has likely three more years of incarceration, plus at least another substantial period of time living in the community showing an ability to life crime-free, before he could possibly be ready and able to care for Ana. That is too long to wait for a child of such tender years. Accordingly, this court concludes that the evidence establishes by clear and convincing proof that it is in the best interest of Ana Cristina to terminate the parental rights of her mother and father.
3. Juan and Alexus
Neither Juan nor Alexus have a significant bond with either biological parent. At their young age, they need very much need the stability and permanency that termination of her biological parents' rights and adoption by their paternal grandmother would provide. Their mother has abandoned them. She is unable to care for them now or in the reasonably foreseeable future. Their father has consented to termination of his parental rights. Their best interest lies in termination of those parental rights so that they can begin developing a permanent new family. The court concludes that the evidence establishes clearly and convincingly that the court should terminate the parental rights of their parents.
Based upon the foregoing, the court concludes that it is in the best interests of Marcus, Ana Cristina, Juan, and Alexus to terminate the parental rights of their biological mother, Ms. Ana R., and of their respective biological fathers, Mr. Henry I., Mr. Raul R., and Mr. Juan Luis L., Sr. The court makes this finding in consideration of the ages of each child and their individual needs for a secure and permanent environment, the secure and nurturing relationship that each has with his foster parents at this time, and the totality of circumstances existing CT Page 8682 in this case.
 IV — ORDER OF TERMINATION
The court, having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights and having determined by clear and convincing evidence, upon all of the facts and circumstances presented, that it is in each child's best interests to terminate the parental rights of Ana R., and of their respective biological fathers, Henry J., Raul R., and Juan Luis L., Sr. accordingly ORDERS:
The parental rights of Ana R., Henry J., Raul R., and Juan Luis L, Sr. are hereby terminated as to Marcus, Ana Cristina, Juan, and Alexus.
The Commissioner of DCF of Child and Families is hereby appointed the statutory parent for the purpose of securing an adoptive family or other permanent placement for these children.
The court notes that the DCF employees testified at trial that the present permanency plan of DCF for Ana Cristina was to place in her a different, therapeutic or professional foster home. The court also notes the recommendation of counsel for this minor child that Ana Cristina be able to continue living with her current foster mother. Based on the evidence in this case that she has a reactive attachment disorder that will make bonding with a new caretaker difficult and impairs her ability to trust another environment or form an attachment to another person and that removing her from her present foster parent will be emotionally damaging to her, this court finds that it is not in the best interest of Ana Christina to have her foster home changed and expressly disapproves that permanency plan. The court directs the Commissioner, in developing a new permanency plan for the minor child Ana Cristina, to consider what additional services might be provided to her current foster home. This court will retain jurisdiction over this matter.
Within thirty days of this judgment the Commissioner shall submit a written report addressing such permanency plans; DCF shall file such further reports as are required by state and federal law.
BY THE COURT
 ___________________________ STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT CHILD PROTECTION SESSION CT Page 8683